GRAMES et al. v. CONSOLIDATED TIMBER CO. et al.

(District Court, D. Oregon. June 29, 1914.)

No. 6212.

1. **Vendor and Purchaser** (§ 186*)—**Forfeiture of Contract for Default in Payment—Contract for Good Title.**

A vendor by a contract of which time was made the essence contracted to convey by a good marketable title on payment of the last installment of the purchase price. Before that time, however, the title became clouded by attachment suits, under one of which the land was sold and by a divorce suit. *Held* that, until the title was cleared so that the vendor or his successor in interest could convey by a good title, the purchaser was not in default, and that a court of equity would not declare the contract forfeited where it offered to make payment on receipt of a good title.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 341, 373; Dec. Dig. § 186.*]

2. **Public Lands** (§ 140*)—**Exemption of Homestead from Prior Debts—Construction of Statute.**

The provision of the Homestead Act (Rev. St. § 2296 [U. S. Comp. St. 1901, p. 1398]), that no lands acquired thereunder shall in any event become liable for the satisfaction of any debt contracted prior to the issuing of the patent, is to be construed.literally, and the exemption is not waived by the failure of the debtor to claim it before judgment or sale, but a sale on a judgment for a debt contracted before issuance of the patent, although after the final certificate, is void.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 377–382; Dec. Dig. § 140.*]

3. **Public Lands** (§ 136*)—**Equitable Mortgage—Deposit of Final Homestead Certificate.**

A deposit of the final certificate issued on a homestead entry as security for a debt is not effective to create an equitable mortgage on the land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 364–366; Dec. Dig. § 136.*]

4. **Mortgages** (§ 29*)—**Deposit of Contract for Sale of Land—Delivery Without Assignment.**

The deposit by a vendor of a contract for the sale of land as security for a loan, although without assignment, amounts to a pledge and creates a lien on the purchase money due thereon, and a grantee of the land by a quitclaim deed from the pledgor with knowledge of such prior pledge takes subject thereto.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 54; Dec. Dig. § 29.*]

In Equity. Suit by Virginia Ann Grames, E. Quackenbush, Sara Dorn, W. T. Vinton, and J. T. Wood against the Consolidated Timber Company, the Medford National Bank, and the Medford Grocery Company. Final decree.

C. W. Corby, of Portland, Or., for Grames, Vinton, and Wood.
John Van Zante and A. H. Tanner, both of Portland, Or., for Quackenbush and Dorn.
Stapleton & Sleight, of Portland, Or., for Consolidated Timber Co.
G. M. Roberts, of Medford, Or., and Latourette & Latourette, of Portland, Or., for Medford Nat. Bank.

WOLVERTON, District Judge. On October 3, 1910, Levi M. Grames obtained from the General Land Office a final homestead certificate, pursuant to the provisions of section 2291 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1390), to the northeast quarter of section 35, township 7 south, range 9 west of the Willamette Meridian, containing 160 acres. The patent was not issued until October 1, 1913.

On October 6, 1910, Grames and his wife, Virginia Ann Grames, entered into a contract with the Consolidated Timber Company, of Wisconsin, and G. F. Sanborn, of Portland, Oregon, whereby they agreed to sell the land to the timber company and Sanborn for the consideration of $7,000, $700 of which was to be paid upon the execution of the contract, $2,300 on or before December 1, 1910, and the balance of $4,000 on or before two years from date, with interest on deferred payments at six per cent. per annum. Upon receipt of the consideration in full as stipulated, Grames and wife were to convey, by good and sufficient deed with covenants of warranty, a "good merchantable title" to the land and premises above described. Time was made of the essence of the contract, and forfeiture provided in case of failure to make payments as agreed. The first two payments were made, but the last one of $4,000 has never been made. The timber company has succeeded to the interest of Sanborn in the contract.

In July, 1911, Virginia Ann Grames instituted a suit for divorce against her husband, Levi M. Grames, and on July 3d the plaintiff filed a notice of lis pendens in said cause. The suit resulted in a decree for plaintiff, entered October 4, 1911, granting her a divorce and an undivided one-third of the premises comprising the homestead, and it was further decreed in the alternative that, in case the contract for sale was carried into effect, Mrs. Grames should be entitled to $2,500 out of the purchase price, and the further sum of $300 as attorney's fees, and alimony during litigation.

On September 12, 1911, A. C. Gage, administrator of the estate of Abram Dorn, deceased, instituted an action in the circuit court for Lincoln county, against Levi M. Grames, to recover on account for moneys had and received from decedent between November 1, 1905, and February 1, 1911, and subsequently, on change of venue to Yamhill county, recovered judgment for the sum of $1,248.29; the judgment being rendered April 27, 1912. At the time the action was instituted an attachment was caused to be issued, and on the same day levied upon Grames' homestead, and about September 18th garnishee process was served on the timber company in Portland, Or. Upon rendition of the judgment, the attached property was ordered to be sold, and subsequently, to wit, on November 16, 1912, was sold at sheriff's sale, subject to redemption, to the plaintiff A. C. Gage, administrator of the estate of Abram Dorn, deceased. This sale was confirmed March 25, 1913, and deed executed in due course.

It appears from the administration proceedings of the estate of Abram Dorn, deceased, that his only heirs were Sara Dorn, widow, and Edward L. Dorn, a son, and that E. Quackenbush had succeeded

to the interest of Edward L. Dorn in the estate; and, upon hearing of the final account, it was decreed by the county court of Yamhill county June 20, 1913, that Mrs. Dorn and E. Quackenbush were the owners of a two-thirds interest in the Grames homestead. Prior to the date of this decree, to wit, on March 8, 1913, Levi M. Grames conveyed by quitclaim all his right, title, and interest in the claim to E. Quackenbush; the deed being recorded March 31, 1913. Still later, on October 28, 1913, Virginia Ann Grames conveyed by warranty deed to E. Quackenbush an undivided one-third interest in the home-stead, which deed was recorded November 17, 1913. Quackenbush thus deraigns whatever title he has in the premises. On the same date of receipt of the deed from Mrs. Grames, Quackenbush mort-gaged the undivided one-third interest to J. T. Wood, to secure pay-ment of the sum of $1,700.

Another attachment was levied upon the homestead October 9, 1911, at the instance of the Medford Grocery Company, in an action in-stituted by that company against Grames, in Jackson county, Or. The grocery company, although made a party to this suit, has made no appearance, and is not now represented here.

On February 8, 1911, Grames borrowed $150 from the Medford National Bank, and gave his note for the amount, and on July 12th he borrowed an additional $700, for which he also gave his note. Both notes bear interest at 8 per cent. On the latter date Grames deliv-ered to the bank his final homestead certificate, and also the contract with the timber company and Sanborn, but without any indorsement of either, designed as security for the loans with accumulated in-terest.

The plaintiffs in the present suit demand a forfeiture of the con-tract on the ground that the timber company has defaulted in the last payment, and that Quackenbush and Mrs. Dorn be declared to be the owners in fee of the premises comprised by the homestead, but subject, however, to the mortgage of J. T. Wood.

The defendant timber company, claiming that it has performed the contract on its part so far as it was required to do so under the con-ditions of the title to the homestead, and being now ready to perform in toto by paying the last installment of $4,000, prays specific per-formance thereof, and for such other relief as may seem meet.

[1] From the foregoing statement it is at once apparent that the title to the homestead soon became so involved that the timber com-pany could not safely proceed under its contract; and that condi-tion of title has continued to the present time. Equity is slow to de-clare a forfeiture. Grames and wife were obligated under the con-tract to convey by good title, on payment of the last installment of $4,000, but there never has been a time, according to the record, since the levy of the attachment in the case of Gage, Administrator, v. Grames, that Grames and wife or their successors in interest were able to fulfill their obligation. It must be admitted that the Gage at-tachment clouded the title, and the subsequent judgment and sale of the premises under the execution further complicated the situation. It has led to a claim on the part of Quackenbush that he has deraigned

good title to a portion of the premises, and to a claim on the part of Medford National Bank that the attachment, judgment, and consequent sale are void, and, notwithstanding Quackenbush's quitclaim from Grames, that it has a valid equitable lien upon the homestead.   So that, whatever may be the merit of these conflicting contentions, they serve to render the title insecure, and the purchaser could not be expected to accept it in that condition.   Further than this, there was the Medford Grocery Company's attachment, and the suit by Mrs. Grames for a divorce, all tending in a greater or less degree to cloud the title.   Consequently the Grames and their successors were not in a position to perform, and could not demand payment of the purchase price, and until they could do this there could be no default on the part of the timber company in tendering or making payment of the last installment.   It follows that the plaintiffs are not entitled to forfeiture as prayed.

The timber company is now in a condition to pay, and ready and willing to do so on conveyance to it of good title.

The next question of vital concern is whether the Medford National Bank has a lien on the premises such as it can enforce against the land, or against the purchase money in the hands of the timber company.

[2] It is first urged in this relation that the Gage attachment, judgment, and consequent sale of the homestead are void, because the attachment and judgment were obtained upon a demand that had accrued prior to the issuance of the patent to the Grames homestead; and, second, that the mere deposit of the final certificate and the contract of sale with the bank as security created (1) a lien upon the homestead, and (2) a lien upon the purchase money.

The first contention is sound.   The statute (section 2296, R. S. [U. S. Comp. St. 1901, p. 1398]) provides that:

"No lands [acquired] under the provisions of this chapter shall in any event become liable to the satisfaction of any debt contracted prior to the issuing of the patent."

This provision has received a literal construction, and comprises any debt accruing or existing prior to the date of the issuance of the patent, and, although in some cases affecting the title to the homestead, where the issuance has relation back to the issuance of the final certificate, the clause can bear no such interpretation, as it applies to the exemption designed for the benefit of the homesteader.   Nor do I think that the exemption is waived by the homesteader's failure to claim it before or at the time of judgment, or the sale of the premises on execution, where the proceeding is in invitum.   National Bank v. Riley, 29 Or. 289, 45 Pac. 766, 54 Am. St. Rep. 794; Dickerson v. Bridges, 147 Mo. 235, 48 S. W. 825.

[3] As to the second contention, the doctrine seems to obtain in England that an equitable mortgage may be created by the deposit of title deeds to real property where the same have been lodged with the creditor as a security for debt.   Mandeville v. Welch, 5 Wheat. 277, 5 L. Ed. 87.   But however well the doctrine has become established in English jurisprudence, it lacks the general sanction of the courts of this country.   While the courts of some of the states adhere to

the English holding, the great weight of authority is opposed to it; the most potent factor controlling the decisions being perhaps the statute of frauds and the registry regulations of the several states. Without discussing the principle upon which the opposing view is sustained, it is sufficient to cite some of the cases. Gardner v. McClure, 6 Minn. 250 (Gil. 167); English v. McElroy, 62 Ga. 413; Davis v. Davis, 88 Ga. 191, 14 S. E. 194; Pierce v. Parrish et al., 111 Ga. 725, 37 S. E. 79; Hall v. McDuff, 24 Me. 311; Parker v. Bank, 53 S. C. 583, 31 S. E. 673, 69 Am. St. Rep. 888.

In this view of the law, the deposit of the final certificate was not effective to create an equitable mortgage upon the homestead.

[4] The second branch of the question is whether the deposit of the contract as security for the loan was effective to create a lien on the purchase price remaining due under the contract.

The deposit was made July 12, 1911. This was subsequent to the institution of the divorce suit by Mrs. Grames and the filing of lis pendens, and it could not therefore affect the interest of Mrs. Grames as subsequently determined by decree of the court.

It is objected that, the deposit having been made without indorsement or assignment in writing of the contract, it could not operate as a lien on the fund or purchase money. I am impressed that the transaction constituted a pledge of the contract as security for the payment of the loan, and in this view an indorsement of the contract was not essential to its operation as such, considering the nature of the document deposited. I am so impressed by analogy of a pledge of bills or notes, or of bonds or shares of stock, or insurance policies. All these become legally effective by simple delivery to the creditor without indorsement or writing of any kind. 31 Cyc. 807.

If the contract had been an ordinary bond for a deed, it would hardly be questioned that the vendor could likewise pledge the same, and in like manner, as security, and the pledge would be held valid. There can be no legal distinction between a bond for a deed and a contract for sale of real property, such as the one involved here, because both are obligations to sell and convey, and hence I conclude that the transaction between Grames and the bank was in effect a pledge of the contract as it relates to the purchase price yet due as security for the payment of the loan.

Now, when Quackenbush obtained his quitclaim deed from Grames, he had ample notice and knowledge of Grames' transaction with the bank, and took whatever title he acquired by such deed subject to the pledge of the contract by Grames to the bank, thus entitling the latter to receive payment of the purchase price remaining due above the amount decreed in the divorce suit to be paid to Mrs. Grames, to the satisfaction of its demand, before Quackenbush can recover any part of the fund. The testimony is replete to the effect that Quackenbush had such notice. Mr. C. W. Corby, who was the attorney for Quackenbush in the purchase of Mrs. Grames' interest and in procuring the quitclaim from Grames for him, received a letter from A. C. Gage, written in Portland September 23, 1911, by which Corby was informed that the sheriff's office had notified him (Gage) that

Grames had turned his contract over to a bank at Medford, Or. Subsequently, by letters from Honorable C. L. Reames, bearing date from October 6, to October 16, 1911, Corby was specifically informed that the Medford National Bank held the pledge. Further than this, Gage was himself the agent of Quackenbush in "handling the whole matter," as Corby says, and it is more than probable that Gage disclosed to him the pledge of the contract by Grames; and Quackenbush does not deny that he had the information. So I conclude that he had knowledge of the fact, and consequently took title by the quitclaim subordinate to the pledge.

In the purchase of Mrs. Grames' one-third interest in the homestead, Quackenbush was to and did pay her $2,000. This, under the agreement between them, carried the $2,500 allowed to Mrs. Grames in the decree for divorce should the contract of sale be carried into effect, but not the $300 allowed as attorney's fees. An assignment of the decree was sought so as to carry this amount also to the purchaser, but this was refused, and it is clear that Mrs. Grames did not agree to it, nor did she part with that interest in the decree.

The Wood mortgage was given to secure $1,700 of the $2,000 agreed to be given for Mrs. Grames' interest in the homestead, but is subject to the contract appertaining thereto.

Upon the whole, I conclude that the defendant the Consolidated Timber Company is entitled, upon payment of $4,000 and interest at the rate of 6 per cent. per annum from October 6, 1910, to a specific performance of the contract; that out of such sum with the accumulated interest should be paid to Wood sufficient to satisfy his mortgage; to Quackenbush the difference between the Wood demand and $2,500 and the accumulated interest thereon at the rate of 6 per cent. from the date of Mrs. Grames' decree for divorce, namely, October 4, 1911; to Mrs. Grames, as her attorney's fees in the divorce proceeding, $300 and interest at 6 per cent. per annum from the date of the decree; to the Medford National Bank $150, with interest thereon at the rate of 8 per cent. per annum from February 8, 1911, the further sum of $700, with like interest from June 12, 1911, and $100 as attorney's fee; and that the balance, if any remain, be paid to Quackenbush and Mrs. Dorn; the plaintiffs Dorn and Quackenbush to pay the costs of suit.